## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MICHAEL DRESSANDER      )
     )
       Plaintiff,      )
     )     Case No. 19-cv-1395
       v.      )
     )     Judge John Robert Blakey
SIMPLICITY FINANCIAL      )
MARKETING, INC.      )
     )
       Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Dressander sues his former employer, Simplicity Financial Marketing, Inc. ("Simplicity"), seeking redress for violations of a separation agreement allegedly formed between the parties. [38]. Defendant Simplicity counterclaims for breach of an earlier employment agreement and breach of fiduciary duty. [57]. The parties cross moved for summary judgment on: (1) Plaintiff's Count IV, which alleges breach of an implied-in-fact contract; (2) Plaintiff's Count V, which seeks a declaratory judgment that the earlier employment agreement is unenforceable; and (3) Defendant's Counterclaims I and II, alleging breach of contract and breach of fiduciary duty, respectively.[1] [164]; [171]. For the reasons explained herein, the Court grants summary judgment—as to liability only—in Defendant's favor on Plaintiff's Count IV and Defendant's Counterclaim II; and in Plaintiff's favor on Plaintiff's Count V and Defendant's Counterclaim I.

---

[1] The parties move for summary judgment on liability only. *See* [172] at 4 n. 4. Disputes regarding damages, where relevant, remain to be resolved.

I.      **Factual Background[2]**

Plaintiff Michael Dressander made his name in the annuity and life insurance marketing business.  [174] ¶ 2.  He launched his career in that industry in the mid-1980s and, in 1992, he incorporated Dressander & Associates, an insurance marketing organization ("IMO").  *Id*. ¶¶ 2–3.

The relationship between the parties to this case began in December 2010, when Dressander sold his interest in Dressander & Associates to Futurity First Financial Corporation ("Futurity"), which has since changed its name to Simplicity Financial Marketing Holdings ("SFMH").  [174] ¶¶ 12, 15.  Futurity initially continued to operate the IMO as Dressander & Associates and hired Dressander as President of the company.  [179] ¶ 4.  Later, Futurity merged Dressander & Associates into Dressander BHC, Inc. and ultimately its name changed to Simplicity Financial Marketing Inc. ("Simplicity"). [179] ¶ 7.  Plaintiff thus identifies Simplicity as Defendant in this action.

A.      **Insurance Marketing Organizations**

IMOs act as middlemen between life insurance carriers and the agents—known as "producers"—who sell the carriers' products.  [174] ¶ 3; [179] ¶ 2.  IMOs recruit producers to sell insurance and annuity products to their clients; insurance carriers pay commissions to both the IMOs and producers.  [174] ¶ 3.  Carriers typically offer standard rates to IMOs, with rates "more favorable for IMOs that achieve certain volume numbers."  *Id*. ¶ 11.  Plaintiff estimates that there are "over

---

[2] The Court draws the undisputed facts from the parties' Local Rule 56.1 filings, [165], [173], [174], [179], [180], and [190].

50 large insurance carriers that sell index annuities; there are hundreds of IMOs across the country; and there are hundreds of thousands of independent insurance agents (*i.e.* producers) across the country." *Id*. ¶ 4.[3]

Under some circumstances, IMOs choose to share a portion of their commissions with producers as a recruiting tool. [174] ¶ 11. As a general matter, however, IMOs "offer similar services, products and offerings to producers for very similar pricing." *Id*. ¶ 6. IMOs including Defendant recruit producers through email solicitations and promotions; producers frequently receive such solicitations from multiple IMOs. *Id*. ¶ 6. The parties agree that any interested party could learn through public sources the identities of insurance carriers and even lists of producers and their contact information. *Id*. Further, most producers "will readily identify" the identities of "their current IMOs and the business terms they have with those IMOs." [174] ¶ 10.

Few if any exclusive relationships exist in the IMO industry. Insurance carriers may have dozens or even hundreds of different IMOs under contract; similarly, IMOs may have contracts with multiple carriers simultaneously. [174] ¶ 8. Because of these dynamics, relationships prove central to the industry. The parties agree that "producers often want to do business with IMO representatives they like and trust" and "it is not uncommon for producers to change IMOs for reasons such as better service, different marketing opportunities, or personal friendships." [174] ¶ 9.

---

[3] Defendant does not dispute "that there are numerous carriers, IMOs, and producers across the country" but does not adopt these numerical estimates. [174] ¶ 4.

### B.    Futurity Purchases Dressander & Associates

When Plaintiff joined Defendant as President in 2010, he signed an employment contract that included two-year post-employment non-solicitation and non-competition provisions ("2010 Employment Agreement"). [174] ¶ 13. He also signed separate restrictive covenants pursuant to the sale of the business. *Id.*

While employed with Defendant, Plaintiff oversaw operations of its Naperville, Illinois office and had "some degree of supervisory responsibility" for personnel in the Houston and Scottsdale offices as well. [179] ¶ 8; [174] ¶ 77. His work included "developing and maintaining key customer relationships, maintaining profitability, hiring and firing personnel, securing relationships with employees and customers, and development and implementation of business strategies." [179] ¶ 8.

The first dispute between the parties evidenced in the record took place in mid-April 2017, when Plaintiff purchased an ownership interest in An Agent's Life, "a small agency that serviced certain policyholders for an insurance carrier called Life of the Southwest." [174] ¶ 65. An Agent's Life serviced "orphan policy holders"— policyholders whose policies have no active life insurance producer assigned to them. Plaintiff paid $100,000 towards this purchase and thereafter, on April 25, 2017, informed Simplicity's senior management of the purchase. *Id.* ¶ 66. Plaintiff offered to assign to Simplicity the stake he had purchased in An Agent's Life. *Id.* Simplicity declined and demanded that Plaintiff divest himself of the interest. *Id.* ¶ 67. He did so promptly. *Id.*

### C. Changes to Plaintiff's Role

In early 2018, Defendant began "discussing a change in Dressander's role at the company" and considering downsizing or restructuring the Naperville office. [179] ¶ 18. Plaintiff also began reporting to another executive, Dave Vick, as his supervisor. *Id.* ¶ 19.

The parties then began exchanging draft separation agreements. On February 5, 2018, Simplicity sent Dressander a draft proposing that he remain employed in a transitional capacity[4] through December 31, 2018, and thereafter become subject to one-year non-compete and non-solicitation restrictions. [174] ¶ 24; [166-1] at 87–95.

During a lunch meeting on March 15, 2018, Dressander and Simplicity executive Bruce Donaldson further negotiated the terms of Dressander's separation. Dressander told Donaldson that he intended to re-enter the annuity business after the end of any non-compete period and "would prefer one year of severance pay and a one year non-compete period." [174] ¶ 25. On March 20, 2018, Donaldson sent the following text message to Dressander:

> Mike: we are good at 1 year on the terms we discussed: announcement internally and externally as agreed, work (if required) from home office, reasonable assistance with positive messages to Naperville team, structured unwind over the year from designated principal, 1 year Non-compete, etc, no Brookstone affiliation, protection of our confidential information, etc. and release after 1 year. Happy to discuss or if this works for you I will have papers drawn up. Let me know or just call me to bust my chops… Best, Bruce.

---

[4] More precisely, the February 5, 2018 draft proposes ongoing employment through a "Transition Period" and "Support Period" to end in December 2018. [166-3] at 16. This contrasts with later proposals, which specified Plaintiff's employment would end much earlier in the year and require him to provide post-employment "transition services." [166-3] at 57. The Court relies on the draft agreements themselves, rather than the parties' characterizations, to draw this distinction.

*Id.* ¶ 26.

The parties further negotiated the terms. On April 4, 2018, Simplicity's counsel sent Dressander's counsel a revised separation agreement, which included an immediate (and, in fact, backdated) termination date of March 31, 2018, rather than termination at the end of 2018; one year of severance pay; and one-year non-compete and non-solicitation terms. [174] ¶ 28; [166-3] at 56. In addition, while the initial February 5 draft had specified a transitional period of employment, this document provided for *post-employment* "transition services." [166-3] at 57. Dressander's attorney reviewed the April 4 document and proposed further revisions on April 18, 2018. [174] ¶ 29. Simplicity replied two days later, on April 20, 2018, with another draft. [166-3] at 61. The new draft did not change the date of separation or length of non-compete or severance terms. [174] ¶ 29. Then, on April 23, 2018, Plaintiff's attorney informed Simplicity that "the modified agreement is acceptable to us." *Id.* ¶ 30. After that, the parties note no further communications regarding the severance agreement. Neither party executed the agreement at any time. *Id.* ¶ 41.

While the severance agreement negotiations took place, a few other events unfolded. First, on March 5, 2018, unbeknownst to Defendant, Plaintiff visited a direct competitor: Kestler Financial, Inc. [179] ¶ 41. He travelled with Defendant's top marketer, John McDermott, and one of McDermott's top agents, Steve Smith; upon arrival, McDermott and Dressander together met with Kestler's executive team. *Id.* ¶¶ 42–43. Plaintiff funded the three travelers' airfare costs. *Id.* ¶ 44. McDermott

thereafter resigned from Simplicity and joined Kestler; Smith also left Simplicity. *Id.* ¶ 50.

Second, on or about April 11, 2018, an employee named John Thompson gave Plaintiff a flash drive containing company information such as marketing materials, contact information for Simplicity's insurance producers, and production data. [179] ¶ 30. Plaintiff told Defendant about it and Defendant asked Plaintiff to turn over the flash drive so it could investigate. [174] ¶ 36. Through his attorney, Plaintiff did so. *Id.* As of the April 20 draft severance agreement, however, Defendant had not yet received the flash drive, so in the email accompanying its draft, Defendant's attorney wrote: "We have not yet received and evaluated the materials you were sending me, so Simplicity reserves the right to discuss that issue." *Id.* ¶¶ 29, 42. Simplicity investigated and filed suit against other employees involved in the incident, but never took action against Plaintiff.[5]

Beginning in late March 2018, Plaintiff no longer maintained an office at Simplicity's Naperville location. [174] ¶ 31. He returned company property such as keys, key fobs, computers, telephones, credit cards, physical files, and electronic files. *Id.* ¶ 32. He stopped receiving weekly management reports or invitations to management meetings; he stopped participating in management meetings, sales

---

[5] The parties raise numerous factual disputes regarding this incident. For example, there is some evidence that Dressander directed Thompson to create the flash drive in the first place. [179] ¶ 34. No disputed facts, however, would materially impact the Court's decision today. In fact, the significance of this incident at all remains unclear: Defendant initially pled this incident as part of its Counterclaim II (alleging breach of fiduciary duty), *see* [52] ¶ 36, but does not pursue this as a basis for summary judgment, waiving the opportunity to do so. *See Keck Garrett & Assocs. v. Nextel Communs., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008). Now, Defendant simply cites the flash drive incident as among the reasons it became unwilling to negotiate a severance agreement with Plaintiff, while Plaintiff disputes this narrative. [172] at 29; [174] ¶ 42.

calls; he neither met with nor approved producers; and he did not manage Simplicity employees. *Id.*

On April 25, 2018, SFMH decided to close Defendant's Naperville office entirely, effective May 4, 2018. [174] ¶ 39. The relationship between the parties, however, did not end there. Plaintiff retained access to his company email address, which Defendant monitored. *Id.* ¶ 46. When Plaintiff received emails related to a function no longer his responsibility, he forwarded those emails to the appropriate person. [179] ¶ 54.

Plaintiff also continued to assist Defendant with ongoing legal matters. On July 9, 2018, Plaintiff met with one of Defendant's employees in Connecticut "to call Simplicity customers about a DOL rule change." [179] ¶ 57. At Defendant's request, Plaintiff also travelled to assist with ongoing lawsuits in May 2018 and September 2018. Plaintiff submitted affidavits in those lawsuits, continuing to identify himself as a principal of Simplicity. *Id.* ¶ 53. Also, during this time, Defendant continued to pay Plaintiff at an annualized rate of $325,000, the same salary he received prior to the separation negotiations. *Id.* ¶ 55. He also continued to receive 401(k) benefits—a benefit reserved for those receiving payroll compensation. *Id.* ¶¶ 55–56. Although a payroll office employee inquired with Bruce Donaldson in March 2018 whether the payments to Plaintiff should be considered severance, the record does not indicate whether Donaldson or anyone else ever responded. [175] ¶ 34; [166-4] at 1.

On September 26, 2018, while Plaintiff was in Alabama assisting Defendant with one of its lawsuits, [174] ¶ 48, Defendant's counsel informed Plaintiff that

Plaintiff had violated the parties' 2010 Employment Agreement by accompanying McDermott to Kestler, and by engaging in "other actions that are inconsistent with your ability to remain an employee of Simplicity." [166-4] at 56. Thus, Defendant informed Plaintiff that it was terminating him for cause. *Id.*; [174] ¶ 48. Defendant's counsel said Defendant might sue Plaintiff if he tried to contest the termination, even handing Plaintiff a draft complaint for breach of contract, breach of fiduciary duty, conversion, and misappropriation of trade secrets, alleging $20 million in damages. [174] ¶ 49; [166-4] at 58. It remains unclear from the record whether Defendant's counsel or Plaintiff discussed the 2018 severance negotiations and what impact, if any, the parties believed this had upon the enforceability of the 2010 Employment Agreement.

### D.    Plaintiff Joins Advisors Ignite

In early 2019, Dressander began helping another former Simplicity employee, Steve DeJohn, acquire Secure Retirement Solutions ("SRS"), a business that provided telemarketing leads to captive insurance agents. [174] ¶ 59. The parties dispute the extent of Plaintiff's involvement in the early stages of DeJohn's endeavor, [179] ¶¶ 73–79, but agree that Plaintiff flew to Ohio to meet with SRS owners and assist DeJohn in evaluating the company's financials and operations. [174] ¶ 58. On April 15, 2019, DeJohn acquired SRS on behalf of his new IMO, Advisors Ignite. *Id.* ¶ 60. Advisors Ignite competes with Defendant. [179] ¶ 69.[6]

---

[6] Plaintiff fundamentally acknowledges this, but disputes whether the entities compete "on all lines of business and with respect to all carriers." [179] ¶ 69.

On April 24, 2019, Dressander advised Simplicity that "he believed his one-year restrictive covenant had expired at the end of March 2019" and he "intended to join Advisors Ignite, a company founded by Steve DeJohn, on or about June 1, 2019." [174] ¶ 61. The parties dispute whether Dressander worked for Advisors Ignite prior to June 1, 2019, but they agree that he worked for the company from that date forward. [179] ¶¶ 61–62.

## II. Legal Standard

Summary judgment is appropriate if there exists no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party may not demonstrate a genuine issue of material fact by showing "the mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (emphasis in original), or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a fact remains material only if it might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992). A genuine issue of material fact exists when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).

In deciding a motion for summary judgment, a court must construe the record "in the light most favorable to the nonmovant" and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When reviewing a motion for summary judgment, courts do not

"weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.

## III.  Analysis

As a preliminary matter, the Court grants Defendant's motion for leave to file excess pages, [184].  While Defendant filed the request for leave to exceed the page requirement well after it filed the overlong memorandum itself, [172], the Court finds that Plaintiff suffered no prejudice from Defendant's excessive filing.  Further, like Defendant, Plaintiff had the opportunity to request leave to file excess pages should he have needed them.[7]

### A.      Count IV: Implied-in-Fact Contract

At the motion to dismiss stage, the Court dismissed Plaintiff's claims predicated upon formation of an express agreement regarding severance, it but left open the possibility that the course of conduct taken by the parties might evidence an implied-in-fact contract under Illinois law.  [56].  Therefore, the Court allowed Plaintiff to proceed with his Count IV, which alleges that Defendant's March 2018 severance discussions with Plaintiff and the parties' conduct thereafter created a binding implied-in-fact contract that superseded the 2010 Employment Agreement. Count IV also alleges that Defendant breached this implied-in-fact contract by failing to make severance payments to Plaintiff.  [38] ¶ 88.

Now, the parties cross move for summary judgment on Plaintiff's Count IV. Plaintiff argues that the undisputed evidence shows that the parties formed an

---

[7] In addition, the Court notes Plaintiff's arguments regarding Defendant's Local Rule 56.1 compliance, but find no errors material to the outcome of the case.  [181] at 4.

implied-in-fact contract in March 2018 governing his separation from Defendant. [166] at 7–9; [181] at 4–9. Defendant argues, however, that no reasonable jury could find a meeting of the minds regarding any alleged agreement. [172] at 26–34; [189] at 4–8.

Illinois law provides for the possibility of a contract implied in fact between parties who have not formed an express agreement. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Whether an implied-in-fact contract has been formed depends upon whether the parties' conduct shows an intent to be bound to the terms of the agreement. *Schivarelli v. Chi. Transit. Auth.*, 823 N.E.2d 158, 165–66 (Ill. App. Ct. 2005). In such a case, "a contractual duty is imposed by reason of a promissory expression inferred from facts, circumstances and expressions by the promisor showing an intent to be bound. Such contract may be proved by circumstances showing that the parties intended to contract and by the general course of dealing between them." *Id.*

The requirements for an implied-in-fact contract remain as rigorous as those for an express contract, since "an implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *A.E.I. Music Network, Inc. v. Bus. Computers, Inc.*, 290 F.3d 952, 956 (7th Cir. 2002) (quoting *Overseas Development Disc Corp. v. Sangamo Constr. Co.* 840 F.2d 1319, 1330 (7th Cir. 1988) (applying Illinois law)).

To prevail upon a claim for breach of a contract implied in fact, then, Plaintiff must establish a meeting of the minds showing a mutual intent to contract in addition to the other elements of a breach of contract claim; to survive Defendant's cross motion for summary judgment, Plaintiff must present evidence sufficient to permit a reasonable jury to find in his favor on this question. An implied-in-fact contract "may be found by examination of the acts of the parties even in the absence of any express statement of specific agreement regarding the details of the contractual relationship." *Kohlenbrener v. N. Suburban Clinic, Ltd.*, 826 N.E.2d 563, 567 (Ill. App. Ct. 2005); *see also In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 531 (N.D. Ill. 2011). As Plaintiff highlights, where a draft agreement exists, "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it." *Landmark Prop., Inc. v. Architects Int'l-Chicago*, 526 N.E.2d 603, 606 (Ill. App. Ct. 1988) (internal citations omitted). For a course of conduct to act as consent to a contract, however, "it must be clear that the conduct relates to the specific contract in question." *Id.* at 606 (citing *Lynge v. Kunstmann*, 418 N.E.2d 140 (Ill. App. Ct. 1981)).

According to Plaintiff, the parties formed an implied-in-fact contract in March 2018 that included termination as of March 31, 2018, a one-year period of non-competition and non-solicitation, and one year of severance in the amount of his prior salary, $325,000. [166] at 8. In support of this contention, Plaintiff points to Donaldson's March 20 text and the subsequent draft agreements, which he maintains "faithfully reflect" the terms of the text. *Id.* Plaintiff acknowledges that the parties

never signed any version of the agreement but insists that the parties' actions beginning in March 2018 evidence their mutual consent to its terms.  Plaintiff does not specify whether a particular draft agreement controls, but rather appears to assert that all of the drafts following the March 20 text message reflect a binding agreement formed between the parties as of that date.  *Id.*; [179] ¶ 9.

Defendant, for its part, invokes the terms of the 2010 Employment Agreement, which requires all modifications to be made in writing and executed by the parties. [166-1] at 72.  It also argues that the parties' actions in 2018 do not reflect a meeting of the minds regarding severance, but rather reflect a failure to reach a severance agreement, thus leaving the 2010 Employment Agreement in place.  [189] at 8.

As to the 2010 Employment Agreement's written modification requirement, courts frequently find that such terms are not dispositive if the parties' conduct clearly shows an agreement to proceed to the contrary.  *Tadros v. Kuzmak*, 660 N.E.2d 162 (Ill. App. Ct. 2006) ("The law seems well settled; the terms of a written contract can be modified by a subsequent oral agreement even though, as in this case, the contract precludes oral modifications.").  Thus, if the parties' conduct unequivocally showed intent to be bound by a new agreement, then an implied-in-fact superseding contract could exist despite the provision in the 2010 Employment Agreement.  Count IV, therefore, turns upon whether at summary judgment Plaintiff presents sufficient evidence to support his claim that the parties' course of conduct unequivocally indicates assent to the March 2018 severance agreement.

Plaintiff frames the parties' actions in terms of two stark alternatives: the parties either acted in accordance with: (1) the 2010 Employment Agreement under which he served as President of the company; or (2) the 2018 severance agreement under which he would leave the company at the end of March 2018. He thus casts all evidence of his decreasing workload as evidence of Defendant's consent to the 2018 severance agreement. He also notes that, as of late March 2018, he no longer acted as President, as the 2010 Employment Agreement would require. Thus, by his reasoning, the alleged severance agreement *must* govern.

Plaintiff, however, ignores another plausible explanation for the parties' course of conduct, which is the one Defendant offers: the parties had an understanding that Plaintiff would transition out of the company but never came to an agreement regarding the terms of that transition. [189] at 8. As noted above, for a course of conduct to act as consent to a contract, "it must be clear that the conduct relates to the specific contract in question." *Landmark Prop.*, 526 N.E.2d at 606 (citing *Lynge*, 418 N.E.2d at 140).

The draft agreements in the record show that plans for Plaintiff's departure came about via iterative process: the February 5th draft kept him employed until December 31, 2018 in a transitional role with a one-year non-compete beginning after that; beginning with the April 4th draft, the written terms included more immediate termination followed by post-employment "transition services." *See* [166-1] at 86; [166-3] at 56. Further, Plaintiff agrees that he began to transition his workload to other employees and reporting to Dave Vicks as his supervisor before the parties

allegedly formed the agreement he seeks to enforce. The factual record thus confirms a transition playing out generally, rather than an agreement by conduct to the March 2018 terms *in particular*.

Plaintiff also points to the lack of work he performed: he packed up his office, went home, and no longer participated in management meetings. True, these facts remain undisputed, but they do not possess the significance he assigns to them. Defendant's knowledge and acceptance of, and support for, his reduced workload, do not show an agreement to the specific contract he alleges. That conduct, while consistent with the alleged contract, is equally consistent with the transition already underway and cannot, without more, establish an unequivocal agreement to the text and/or subsequent drafts. Plaintiff's evidence regarding severance payments also fails to clearly establish agreement. Both parties agree that Plaintiff's pay, both before and after March 2018, remained the same. [174] ¶ 44. Continued payments after March 2018, therefore, fail to show that the parties acted in accordance with the March text or April drafts, as opposed to the February 5 draft, or that the payment went from a salary payment to a severance payment as of March 31, 2018.[8]

---

[8] Plaintiff also argues that Defendant's response to the "Thompson flash drive incident"—firing Thompson and filing suit against him—definitively establishes that Defendant no longer considered Dressander an employee. [166] at 9. But the evidence Plaintiff cites—Defendant's state court complaint, filed May 11, 2018—presents Dressander as the principal of Simplicity's Naperville office, and in no way suggests that he was an unauthorized third-party recipient of the company's trade secrets. [166-4] at 6–7. Thus, if anything, the state court action supports Defendant's position that Plaintiff remained an employee at the time of the incident. Similarly, Plaintiff states in briefing that Defendant did not include him on a list of then-current Naperville office employees when the office was closed in May 2018, suggesting that this means Defendant no longer considered him an employee at that time. [166] at 9. Plaintiff's citations do not support this characterization, however, as his cited exhibits appear to reference only a list of employees set to be laid off, not a list of ongoing employees. *See* [174] ¶ 39.

For the parties' conduct to establish formation of an implied-in-fact contract, Plaintiff must identify actions consistent with that contract and distinguishable from the parties' preexisting course of conduct. Such evidence could include conduct evidencing the specific terms of the severance agreement that Plaintiff seeks to enforce, such as facts showing consent to March 31, 2018 as the date his severance period began, consent to the one-year period of severance pay, or agreement to a one-year non-compete term. Plaintiff's evidence falls short, however, since nothing that he points to shows that the parties agreed these terms, specifically. Thus, he cannot establish that Defendant's actions—such as the September 26, 2018 notice of termination and stoppage of his paychecks—constitutes breaches of the alleged severance agreement.

Instead, numerous facts in the record weigh in favor of Defendant's version of events. The fact that the transition began before Plaintiff alleges that the agreement was formed remains critical; that the parties continued to exchange drafts following the formation of the purported agreement also strongly rebuts a finding of an agreement. Plaintiff signed two affidavits identifying himself as a Simplicity principal on September 26, 2018 (the same day he was later terminated). *See, e.g.* [173-6] at 2 (stating "I am a Principal of Simplicity Financial Marketing Inc." despite describing his work functions in the past tense). Further, Plaintiff continued to receive 401(k) contributions until the for-cause termination in September 2018—a benefit only available to those receiving payroll compensation, not severance. [179] ¶¶ 55–56. Plaintiff attributes this to Defendant's error; Defendant cites it as evidence

of Plaintiff's ongoing employment. Plaintiff had ongoing access to his company email, which he insists was pursuant to the post-employment "transition services" term in the agreement he argues was formed. Defendant cites this as evidence that he remained an employee. Finally, the for-cause termination itself strongly suggests no agreement. Plaintiff characterizes this as an effort by Defendant to undermine—and indeed a breach of—the severance agreement reached. Defendant cites it as evidence that the parties failed to reach an agreement.

Based upon the record, Plaintiff bears the burden to establish an implied-in-fact contract. Although he does not need to prove his claim to survive summary judgment on Count IV, he still must point to some evidence from which a reasonable jury could find a clear, unequivocal agreement to the 2018 severance agreement. Plaintiff has failed to do so. No reasonable jury could find for Plaintiff on this question and thus the Court grants Defendant's motion for summary judgment as to Count IV. This result reflects the high burden a plaintiff faces to establish an implied-in-fact contract and why parties often proceed at their own peril by not executing written agreements to avoid precisely the type of situation now at issue.

**B. Count V (Declaratory Judgment) and Counterclaim I (Breach of Contract)**

Next, Plaintiff's Count V seeks a declaratory judgment[9] that the 2010 Employment Agreement is unenforceable as a matter of law because it includes unenforceable restrictive covenants, while Defendant's Counterclaim I alleges that

---

[9] "The Declaratory Judgment Act, 28 U.S.C. § 2201, allows federal courts, in their discretion, to render declaratory judgments . . . where there exists an actual controversy." *Bell v. Taylor*, 827 F.3d 699, 711 (7th Cir. 2016) (internal quotation marks omitted). The Court finds an actual controversy here.

Defendant breached the 2010 Employment Agreement's restrictive covenant provisions. [38] ¶¶ 105–110; [52] ¶¶44–51. The parties now cross move for summary judgment on both claims.

The 2010 Employment Agreement contains two-year restrictive covenants, including non-competition and non-solicitation provisions. [166-1] at 68–69. The contract bars Plaintiff from directly or indirectly soliciting "in competition with the Company, its subsidiaries or any of their affiliates, the business of any client or prospective client": (1) "with whom Executive had personal contact or dealings on behalf of the Company its subsidiaries or any of their affiliates during the one year period preceding Executive's termination of employment"; (2) "with whom employees reporting to Executive have had personal contact or dealings on behalf of the Company its subsidiaries or any of their affiliates during the one year immediately preceding the Executive's termination of employment"; or (3) "for whom the Executive had direct or indirect responsibility during the one year immediately preceding Executive's termination of employment." [166-1] at 68.

The non-compete provision requires, further, that during the restricted period, Plaintiff will not "directly or indirectly":

(i)     engage in any insurance brokerage, marketing, agency or underwriting services or any other business that competes with the business of the Company, it [sic] subsidiaries or any of their affiliates (including, without limitation, businesses which the Company, its subsidiaries or any of their affiliates have specific plans to conduct in the future and as to which Executive is aware of such planning) in any geographical area in the world (a "Competitive Business");

19

(ii)    enter the employ of, or render services to, any Person (or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business;

(iii)   acquire a financial interest in, or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, principal, agent, trustee or consultant; or

(iv)    interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the Company, its subsidiaries or any of their affiliates and customers, clients, suppliers, partners, members or investors of the Company, its subsidiaries or any of their affiliates.

[166-1] at 68.  The agreement further bars Plaintiff from directly or indirectly soliciting away or hiring current or recent employees of the company or its affiliates. Id. at 69.

First, Plaintiff appears to agree with Defendant that, in the absence of a superseding agreement, the 2010 Employment Agreement governs the parties' relationship.  [166] 1–2.  His Count V, however, seeks a declaratory judgment that the 2010 Employment Agreement's restrictive covenants remain unenforceable as a matter of law.  Upon this basis, he also argues that Defendant's Counterclaim I, which seeks to enforce the non-compete provision, fails.  [166] at 2.  Defendant disagrees, arguing that the undisputed evidence establishes that Plaintiff breached the non-compete, which remain enforceable under Illinois law.[10]

---

[10] Defendant also asserts that Plaintiff should be equitably estopped from challenging the enforceability of the 2010 Employment Agreement, because Plaintiff signed the agreement in multiple capacities, thereby purportedly attesting that he found the terms reasonable.  [172] at 13.  Defendant insists that because Plaintiff agreed to the terms of the restrictive covenant at the time, the Court should not let him dispute them now.  The Court finds this argument frivolous and flatly contradicted by precedent.  Taken to its natural conclusion, Defendant's equitable estoppel theory would preclude legal challenges to any agreed-to restrictive covenant, no matter how unreasonable or over-restrictive the terms.  On the contrary, Illinois law requires courts to closely scrutinize such covenants. *Bishop v. Lakeland Animal Hosp., P.C.*, 644 N.E.2d 33, 35 (Ill. App. Ct. 1994) ("Illinois courts favor fair

Under Illinois law, the enforceability of a restrictive covenant is a question of law for a court to decide. *Mohanty v. St. John Heart Clinic,* 866 N.E.2d 85, 91 (Ill. 2006). As Plaintiff emphasizes, Illinois courts "abhor restraints on trade" and thus disfavor, and closely scrutinize, restrictive covenants in employment contracts. *McInnis v. OAG Motorcycle Ventures*, 35 N.E.3d 1076, 1082 (Ill. App. Ct. 2015); *Health Prof'ls, Ltd. v. Johnson*, 791 N.E.2d 1179, 1188 (Ill. App. Ct. 2003) ("Restrictive covenants implicate the competing principles of freedom of contract and the policy against contractual restraints of trade. Because strict adherence to the latter policy would result in rejection of all such contracts, the courts have applied a doctrine of reasonableness in an attempt to reconcile these conflicting principles.").

Illinois law enforces restrictive covenants only where: (1) ancillary to a valid transaction (here, the employment contract); (2) supported by consideration; and (3) containing reasonable restraints. *See Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396–97 (Ill. 2011). The parties here do not dispute that the restrictive covenants here satisfy the first two factors, and thus the dispute centers upon whether they constitute "reasonable restraints."[11]

The Illinois Supreme Court has promulgated a "three-dimensional rule of reason" to guide the enforceability inquiry. *Id.* at 396. Illinois courts will find a

---

competition and disfavor restraints of trade. Therefore, noncompetition clauses are closely scrutinized.").

[11] Illinois law views more generously restrictive covenants made pursuant to the sale of a business, than those made pursuant to employment agreements. *See Central Water Works Supply, Inc. v. Fisher*, 608 N.E.2d 618, 621 (Ill. App. Ct. 1993). While the 2010 Employment Agreement was executed at the same time as the sale of Dressander & Associates to Defendant's predecessor, Futurity, a separate agreement provided restrictions pursuant to the sale. [174] ¶ 13. Thus, the restrictive covenants at issue here relate to an employment contract, not the sale of a business.

restraint on trade reasonable if it: (1) is "no greater than is required for the protection of a legitimate business interest of the employer-promisee"; (2) "does not impose undue hardship on the employee"; and (3) is "not injurious to the public." *Id.* Application of the "rule of reason" remains a highly fact- and industry-specific inquiry. *See id.* at 400 ("There is no inflexible formula.").

Based upon the undisputed facts here, the Court finds that the 2010 Agreement's non-competition provisions and non-solicitation provisions do not satisfy the rule of reasonableness test and, therefore, remain unenforceable.

First, as to the non-competition provisions, Illinois law holds that an employer may only protect a distinct, "legitimate" interest. *Reliable Fire*, 965 N.E.2d at 396–97. As a general rule, an employer has no protectable interest in its clients; thus, simply referencing customer relationships does not itself establish a protectible interest. *See Instrumentalist Co. v. Band, Inc.*, 480 N.E.2d 1273, 1279 (Ill. Ct. App. 1985). Illinois courts recognize an exception, however, "if, by the nature of the business, the customer relationship is near-permanent and but for" the employment relationship, the former employee "would never have had contact with the clients in question." *Reliable Fire*, 965 N.E.2d at 401 (citing *Nationwide Advising Service, Inc. v. Kolar*, 329 N.E.2d 300, 302 (Ill. App. Ct. 1975)). A court evaluates whether this exception applies using a "totality of the circumstances" test that should remain flexible and may consider a variety of factors. *Id.*

Here, Defendant has not established that its specific customer relationships warrant protection.[12] Even under *Reliable Fire*'s flexible "totality of the circumstances" test, near-permanence remains a guiding concept for courts when evaluating whether an employer has a protectible interest in customer relationships. *See, e.g.*, *Dent Wizard Int'l Corp. v. Andrzejewski*, No. 2-20-0574, 2021 WL 1611106, at *4 (Ill. App. Ct. Apr. 23, 2021). While employers need not show "perpetual or indissoluble" relationships, *see Audio Properties, Inc. v. Kovach*, 655 N.E.2d 1034, 1037 (Ill. App. Ct. 1995), longevity of relationships factors into the analysis, as does the specialized nature of services, where, for example, a business engenders "loyalty by providing a unique product or personal service," *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 444 (Ill. App. Ct. 1997). Courts also consider the difficulty of retaining new clients, including the requisite amount of time and money invested in that process. *Audio Props.*, 655 N.E.2d at 1037.

Defendant agrees that the IMO industry is characterized by non-exclusive, frequently-shifting relationships. The record includes no evidence that Defendant operates in a manner distinct from other IMOs, that it employs unique services tailored to specific producers, or that the process of attracting new customers is a time- or resource-intensive one. Relationships unquestionably remain important in how producers choose which IMOs to work with, but lack of exclusivity and frequently shifting affiliations tempers the significance of that dynamic. *See U.S.A. Glas, Inc.*

---

[12] *See Cambridge Eng'g, Inc. v. Mercury Partners*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2005) (noting that the employer bears the burden of establishing that the full extent of the restriction is necessary to protect its interests).

*v. Webb*, No. 94-CV-0958, 1995 WL 59252 (N.D. Ill. 1995) (finding that even when professional services rooted in trust relationships are involved, "where the clients utilize several providers of the same type of professional service simultaneously, a near-permanent relationship does not exist."); *Springfield Rare Coin Galleries v. Mileham*, 620 N.E.2d 479, 489 (Ill. App. Ct. 1993). Defendant cites no evidence to show it had a protectible interest on its relationships with producers, and thus its arguments remain insufficient to survive summary judgment. Given the totality of the circumstances and the dearth of evidence Defendant presents on this point, the Court finds that Defendant fails as a matter of law to assert a protectible interest.

Yet, even if Defendant had established a protectible interest in its relationship with producers, Illinois law also holds that provisions may not restrict more activity than necessary. Based upon the record, the non-competition provisions here remain far more restrictive than reasonably necessary.

Specifically, the contract defines "competitive business" widely, reaching businesses in a variety of industry sectors, including "any insurance brokerage, marketing, agency or underwriting services" or any other business that competes with Defendant, any of its affiliates or subsidiaries, including any plans for future business of which Plaintiff is aware. [166-1] at 68. The non-competition provisions also do not limit their application to a specific job function or set of functions. Accordingly, the provisions would bar Plaintiff from pursuing work with those businesses in *any* capacity. The restrictions upon Plaintiff's employment remain patently overbroad. *See, e.g., AssuredPartners*, 44 N.E.3d at 472 (finding a non-

24

compete agreement unenforceable where it prohibited a former employee, whose work with the company had focused upon the liability insurance for lawyers, from working in any facet of the insurance brokerage business without "any qualifying language that limits the prohibition" to "the specific kind of professional liability insurance practice he developed during his employment.").

The geographic scope of the non-competition provisions also remains fatally flawed on this record. Illinois courts employ the general principle that the area from which the employee remains restricted should only cover the area in which the employer does business. *Id.* (citing *Cambridge*, 879 N.E.2d at 523). Here, however, the restrictive covenants state that Plaintiff cannot engage in the prohibited competitive activity "anywhere in the world." [166-1] at 68. Defendant does not present any evidence to suggest that its work was global in any sense, stating only that "the nature of the IMO business today means that IMOs have the *ability* to work with producers across the globe." [172] at 13 (emphasis added). Such an argument does not justify the breadth of a restrictive covenant with worldwide applicability. *See, e.g., AssuredPartners*, 44 N.E.3d at 473 (finding the geographic scope of a non-compete overbroad because it restricted the former employee's activity "in every location within the 50 states and territories of the United States," even though the employer only conducted business in the northeast.).

Overall, the non-competition's scope remains overly broad and unreasonable to protect any legitimate business interests that Defendant had. Under Illinois law, it remains unenforceable as a matter of law.

Second, the Court turns to the non-solicitation provisions relating to customers. Compared to non-competition provisions, Illinois courts uphold non-solicitation provisions somewhat more readily. Nonetheless, a non-solicitation clause "is only valid if reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer," and as a result, "courts are reluctant to enforce provisions that prohibit former employees from servicing customers that they never had contact with while working for their original employer." *AssuredPartners*, 44 N.E.3d at 474 (citing *Cambridge*, 879 N.E.2d at 528).

Defendant does not respond to Plaintiff's motion for summary judgment as to the customer on-solicitation provisions, thus conceding the overbreadth. Indeed, here, rather than limit its scope to relationships that Plaintiff developed or maintained while in Defendant's employ, the provision covers any actual or even potential customer relationship of every employee over whom he had responsibility. Such an expansive non-solicitation provision, on its face, exceeds what Illinois law allows. *See, e.g., AssuredPartners*, 44 N.E.3d at 473–74 (holding unenforceable a non-solicitation provision that prohibited the former employee from "directly or indirectly" causing any "[p]otential [t]arget, customer, supplier, licensee or other business relation of plaintiffs and their subsidiaries to cease doing business with plaintiffs and their subsidiaries."); *Cambridge Engineering*, 879 N.E.2d at 528 (finding a non-solicitation clause invalid on its face where it restricted solicitation of all the company's customers regardless of whether the former employee specifically had

contact with them). Accordingly, the customer non-solicitation provisions remain unenforceable.[13]

Third, the contract also includes an expansive set of confidentiality provisions.[14] Plaintiff's Count IV also seeks a declaratory judgment that these, too, remain unenforceable. Defendant does not seek to enforce these provisions in its counterclaim and offers no response to Plaintiff's assertion that the confidentiality provisions are, like the non-compete and non-solicitation provisions, overbroad. Further, as with the non-solicitation provisions, Defendant makes no effort to assert a protectible interest sufficient to uphold the confidentiality provisions.

Indeed, "Illinois views post-employment restrictive covenants that insist on absolute secrecy of any and all information as unreasonable and unenforceable because a person is allowed to make a living, and cannot possibly not utilize *any* information from his past job." *Rubloff Dev. Group, Inc. v. SuperValu, Inc.*, 863 F.Supp.2d 732 (N.D. Ill. 2012) (collecting cases). Where, as here, the confidentiality provisions reach a broad scope of information and are not cabined by any temporal or geographic restrictions, Illinois law declares them unenforceable. *See id*; *AssuredPartners*, 44 N.E.2d at 476 ("There is a great deal of information that

---

[13] Based upon the finding on the scope of the restrictive covenants, this Court need not separately consider the reasonableness of the two-year length of restrictions. Employing such broad covenants for any amount of time remains unreasonable. For the same reason, it also does not separately discuss whether enforcement of the agreement would create undue hardship for Plaintiff or have an injurious impact upon the public.

[14] The confidentiality provisions restrict Dressander from retaining, using, disclosing, divulging, revealing, communicating, sharing, transferring, or providing access to anyone outside the company, and includes a broad-sweeping definition of "Confidential Information." [166-1] at 68. The agreement contains certain qualifications, stating for example that the scope of information deemed confidential shall not include information generally known to the industry or the public. *Id.*

is not 'generally' known to the public; not all of it merits protection under a confidentiality provision."). Thus, the Court grants summary judgment in Plaintiff's favor on this issue as well.

Finally, Defendant argues that even if the restrictive covenants as written remain overly broad, the Court should "blue pencil" the agreement to excise the impermissible portions.[15]  Precedent cautions against engaging in this practice, particularly if it requires a court to effectively rewrite a new agreement to which the parties never agreed.  *Guaranteed Rate, Inc. v. Thomas*, No. 20 CV 3288, 2020 WL 6446947 at *2 n. 9 (N.D. Ill. Nov. 3, 2020) ("The greater the deficiencies, the less likely a court will modify a restrictive covenant because 'that would be tantamount to fashioning a new agreement' and 'could have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in agreements.'") (citing *Lee/O'Keefe Ins. Agency, Inc. v. Ferega*, 516 N.E.2d 1313, 1319 (Ill. App. Ct. 1987)). Finding the overbreadth issues pervasive here, this Court declines to exercise its discretion to modify the agreement.

For these reasons, the Court grants Plaintiff's motion for summary judgment on Count V and Counterclaim I and denies Defendant's cross-motion on the same.

### C.   Counterclaim II: Breach of Fiduciary Duty

Finally, the parties cross move for summary judgment on Defendant's counterclaim for breach of fiduciary duty.  [166] at 1, 13; [172] at 19–25.  Under

---

[15] In making this argument, Defendant emphasizes that the violations they allege against Dressander took place in the same market and same geographic area where his employment with Defendant took place.  [172] at 13.

Illinois law, a party claiming breach of fiduciary duty must show: "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. N. Am. Corp. of Illinois*, 983 N.E.2d 414, 433 (Ill. 2012).

The nature and scope of fiduciary duties vary based upon the role of the fiduciary. In his role as President, Plaintiff was a corporate officer of Simplicity— and thus, indisputably bound by fiduciary duties to the company. Plaintiff does not contest this fact. The duties of a corporate officer include "the duty to act with utmost good faith and loyalty in managing the corporation" and to refrain from "enhancing his or her own personal interests at the expense of corporate interests." *Maecker Point Villas Condo. Assoc. v. Szymski*, 655 N.E.2d 1192, 1194 (Ill. App. Ct. 1995) (internal quotations and citations omitted). The duty of loyalty prohibits a fiduciary from soliciting the employer's customers for himself, enticing coworkers away from an employer, or appropriating the employer's property or business opportunities for himself. *See ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237 (Ill. App. Ct. 1978); *Graham v. Mimms*, 444 N.E.2d 549, 556 (Ill. App. Ct. 1982).

Defendant argues that Plaintiff breached his fiduciary duty when he travelled with John McDermott and Steve Smith to visit Kestler, a competitor in the IMO industry. [172] at 24. Plaintiff does not dispute the facts of the trip, but he argues nonetheless that Defendant's claim fails because it cannot show a resulting injury. [181] at 12.

The parties agree that John McDermott, Defendant's top marketer, travelled with Plaintiff to visit Kestler in early March 2018. They also agree that one of McDermott's top agents, Steve Smith, went along; that Plaintiff funded the trip; and that, following the trip, McDermott resigned in early April 2018, turning down a counteroffer from Defendant in the process. [174] ¶ 75. Moreover, they agree McDermott's agent Steve Smith also left Simplicity at the same time. [179] ¶ 51. Plaintiff did not inform Defendant about the trip. [179] ¶ 45.

Plaintiff argues, however, that his actions did not cause McDermott to leave Simplicity for Kestler. He posits that competitors had long sought to recruit McDermott and that his actions did not cause the loss. He also points to McDermott's deposition statement that he left Simplicity for Kestler because he became dissatisfied with "the changes he saw at Simplicity in late 2017 and early 2018." [174] ¶ 69. Plaintiff also submitted a declaration by McDermott stating that: "Mike Dressander did not pressure me to leave or attempt to persuade me to leave. Frankly, given the climate at Simplicity, I would have left regardless of what Mike had said." [181] at ¶ 14.

Defendant disagrees about why McDermott left Simplicity and Plaintiff's role. It also argues that, regardless of why McDermott left, the trip itself shows that Plaintiff encouraged McDermott and Smith to pivot away from Simplicity and to Kestler. Moreover, Defendant posits that Plaintiff's involvement in the trip and

failure to inform the company about it prevented Defendant from having a meaningful opportunity to offer McDermott a counteroffer.[16]  [172] at 23.

As Defendant correctly argues, a fiduciary may not entice an employee away from the entity to whom he owes the fiduciary duty.  *See ABC Trans.,* 379 N.E.2d at 1237.  Corporate officers "are liable for breaching their fiduciary duties where, while still affiliated with the company, they solicit fellow employees to join a rival business." *Veco Corp v. Babcock*, 611 N.E.2d 1054, 1061 (Ill. App. Ct. 1993). The undisputed facts of the Kestler trip show, at a minimum, that Plaintiff encouraged McDermott and Smith's plans to leave Defendant's employ.  Plaintiff offers no argument and cites no law to suggest that these actions were consistent with his duty of loyalty.  Thus, Defendant has established breach.

A factual dispute remains, however, as to the nature and extent of Defendant's injury.  Plaintiff argues that the Court should grant summary judgment in his favor because Defendant cannot show any injury at all.  In support, Plaintiff cites *Indeck Energy Servs. v. Depodesta*, 183 N.E.3d 746 (Ill. 2021), which reiterated the "fundamental principal that plaintiff must establish an injury to recover for breach of fiduciary duty."

Here, Defendant alleges that it suffered injury when McDermott and Smith left the company.  Defendant attributes that loss to Plaintiff in two ways: first, it argues that Plaintiff's encouragement did, in fact, cause McDermott and Smith to

---

[16] There is evidence in the record that McDermott did turn down a counteroffer from Defendant when he announced his departure for Kestler, *see* [174] ¶ 75, but apparently Defendant disputes the adequacy of this opportunity.

leave; and second, it argues that Plaintiff's failure to alert Defendant to McDermott's upcoming departure deprived Defendant of the opportunity to persuade McDermott and Smith to remain. [172] at 23. Given the factual disputes as to why McDermott and Smith left—many of which rely upon credibility determinations—the Court cannot grant summary judgment to either side on the question of whether the loss of McDermott, and in turn Smith, ought to be attributed to Plaintiff.

Further, even if Plaintiff's actions did not cause McDermott and Smith to leave, "Illinois law permits a complete forfeiture of any salary paid by a corporation to its fiduciary during a time when the fiduciary was breaching his duty to the corporation," *see Levy v. Markal Sales Corp.*, 643 N.E.2d 1206, 1219–20 (Ill. App. Ct. 1994) (internal citations omitted). This concept derives from the "faithless servant doctrine," and creates an equitable path to recovery even where no other injury exists. *See Steinmetz v. Kern*, 32 N.E.2d 151, 154 (Ill. 1941) ("An agent is entitled to compensation only on a due and faithful performance of all his duties to his principal. In the application of this rule it makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal.") (internal citations omitted).

The undisputed facts show that Plaintiff received compensation during the Kestler saga. [179] ¶ 23. Thus, Defendant has established injury, at least as to that payment. Evaluating the extent of the injury, however, requires resolving the disputed issue of fact regarding why McDermott and Smith left and whether Plaintiff

caused them to leave. The Court thus grants summary judgment in Defendant's favor as to liability only on the alleged breach of fiduciary duty related to the Kestler trip.

Finally, Defendant also argues additional alleged breaches, referencing Plaintiff's purchase of An Agent's Life and various comments Plaintiff allegedly made encouraging others associated with Defendant to leave the company. [172] at 23–24.

As to An Agent's Life, Defendant did not plead this allegation of breach in its counterclaim. Because neither party noted this discrepancy, it is unclear whether the issue is even properly before the Court at summary judgment. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996). Regardless, however, Defendant does not develop the facts related this issue sufficient to permit a finding in its favor. Namely, Defendant cites *Graham v. Mimms*, 444 N.E.2d 549 (Ill App. Ct. 1982), for the rule that a corporate fiduciary cannot take "advantage of business opportunities which are considered as 'belonging' to the corporation." 444 N.E.2d at 556. But Defendant does not develop the argument sufficiently to establish that An Agent's Life qualified as a corporate opportunity belonging to Defendant. *See* [172] at 24. Thus, the record does not contain sufficient information to make such a finding; and Defendant not only fails to meet its burden of establishing fiduciary duty based on this incident, but also fails to withstand Plaintiff's motion for summary judgment as to this theory.

Defendant also makes other generalized allegations that Plaintiff "also breached his fiduciary duties by encouraging others associated with Simplicity to leave Simplicity." [172] at 23. The only fact that Defendant offers in support,

however, is that "while Dressander was still President of Simplicity, Dressander told Steve DeJohn, who at that time was an independent contractor working with Simplicity, that he 'would strongly consider finding a different IMO to try and align with.'"[17]  [172] at 24.  Defendant has not submitted sufficient evidence about the circumstances around this comment—such as when or why it was made—to establish a breach of fiduciary as a matter of law.  Because Plaintiff cross-moved for summary judgment, Defendant's failure to marshal sufficient evidence means that it also fails to withstand Plaintiff's motion on this issue.

Thus, Defendant has only shown entitlement to relief with regard to the Kestler trip, and it has not presented sufficient evidence to survive Plaintiff's summary judgment motion on any theory of breach regarding An Agent's Life or Plaintiff's comments to DeJohn.  As to the Kestler trip only, the Court grants summary judgment on liability in Defendant's favor.  The Court grants Plaintiff's motion for summary judgment on the remaining theories.

---

[17] Plaintiff admits making the comment, but states that he did so *after* Simplicity terminated its contract with DeJohn.  [179] ¶ 47.

## IV. Conclusion

For the reasons set out above, the Court grants Defendant's motion for summary judgment as to Count IV and grants Plaintiff's motion for summary judgment as to Count V and Counterclaim I, denying the respective cross motions. The Court grants Defendant's motions for summary judgment as to Counterclaim II, and thus the case may proceed only as to damages on that claim.

Date: 3/17/2023

Entered:

John Robert Blakey
United States District Judge